## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| SHARLON RENEE CHATMAN, | ) |
| | ) |
| Plaintiff, | ) Case No. 07 C 0625 |
| | ) |
| v. | ) Judge John W. Darrah |
| | ) |
| THE VILLAGE OF OAK PARK, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Sharlon Renee Chatman, filed suit against Defendant, the Village of Oak Park, alleging racial discrimination, retaliation, and hostile work environment. Presently pending before the Court is Defendant's Motion for Summary Judgment.

### LEGAL STANDARD

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986) (*Celotex*). All of the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts or by merely resting on its pleadings. *See Hemsworth, II v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) (*Hemsworth*); *Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001). Instead, the party that bears the burden of proof on an

issue must affirmatively demonstrate, by specific factual allegations, that a genuine issue of material

fact exists that requires a trial. *See Hemsworth*, 476 F.3d at 490.

Local Rule 56.1(b) requires a party opposing a motion for summary judgment to file:

> (3) a concise response to the movant's statement that shall contain:
>
> (A) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and
>
> (B) a statement, consisting of short numbered paragraphs, of any additional facts that require denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon.

The district court may require strict compliance with Local Rule 56.1. *See Ammons v. Aramark*

*Uniform Serv., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004); *Bordelon v. Chicago School Reform Board*

*of Trustees*, 233 F.3d 524, 527 (7th Cir 2000) (strict compliance with the local rules governing

summary judgment is upheld given the importance of local rules that structure the summary

judgment process); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like

pigs, hunting for truffles buried in briefs").

In response to several of the Village's proposed statements of undisputed facts, Chatman

indicates that she disputes the proposed statement and then includes additional "facts," apparently

in an attempt to support her dispute of the proposed fact. However, many of the additional "facts"

do not actually dispute the proposed statement and are not presented as additional statements of fact

as required by Local Rule 56.1. For example, Defendant's proposed statement of fact No. 14 states:

"One example of Chatman's interpersonal problems with co-workers occurred on April 20, 2004.

Chatman and McMahon got into a verbal altercation regarding Chatman's assignment to make

name tags for volunteers for an event Sokol was hosting. This incident was one of the bases of Chatman's 2004 EEOC Charge No. 210-2004-07538 (citations to record omitted)." Chatman "disputes" the statement as follows: "Evidence of the result of the poor management skills of Sandra Sokol in allowing her direct report, Sue McMahon to run roughshed over the other employees in the department, and the ineffectiveness of Human Resources, specifically

Frank Spataro, in failing to address a hostile and discriminatory work environment by allowing work relationships to deteriorate to low levels, was a verbal altercation that occurred between McMahon and Chatman on April 20, 2004 (citations to record omitted)." This response fails to properly dispute Defendant's proposed statements of fact. Those proposed statements of fact that are not properly disputed are deemed admitted. The additional "facts" included as part of Chatman's support for disputing proposed facts are also not considered because they are not presented in compliance with Local Rule 56.1(b)(3)(B).

## FACTS

Chatman, an African-American female, began her employment with the Village as a part-time Administrative Clerk in the Village's Manager's Office in June 1998. (Def.s' 56.1(a)(3) Statement ¶ 5). In or around the fall of 1998, Kathleen Cannon, the former Village Deputy Clerk and Chatman's supervisor from September 19, 2000 to June 30, 2005, approached Chatman about applying for the Administrative Clerk position in the Village Clerk's Office. At this time, Cannon was the Secretary to Village Attorney Ray Heise in the Village Law Department. (Id.,¶ 5). Shortly thereafter, Sandra Sokol, the Village Clerk (an elected official), interviewed and promoted Chatman to the position of full-time Administrative Clerk in the Village Clerk's Office. Sokol had been the Village Clerk since April 1993. (Id., ¶ 6). The Village Clerk's Office employees, except for the

3

Secretary to the Village Clerk that is a non-managerial position, are supervised and managed by the Deputy Village Clerk. The Deputy Village Clerk reports directly to the Village Clerk. The Secretary to the Village Clerk reports directly to the Village Clerk. Susan McMahon was the Secretary to the Village Clerk. (Id., ¶ 7).

Frank Spataro has been the Village Human Resource Director since February 2002. Spataro's duties include overseeing the Human Resource Department programs; selection and recruitment, organizational development training, labor relations, benefits, and employee relations; advising the Village Manager on human resource issues and changes in policies or laws; and advising the Village Board on human resource issues through the Village Manager. (Def.'s 56.1(a)(3) Statement ¶ 10). The Labor Relations Manager, Ed Evans, reports to Spataro and is responsible for handling issues involving management and union employees and compliance with the Village's collective-bargaining agreements with the unions that represent its employees. (Id., ¶ 12). The Deputy Village Manager, Ray Wiggins, reports to the Village Manager. (Id., ¶ 13).

Upon her arrival to the Village Clerk's Office in November 1998, Chatman's supervisor was Sokol and, from time to time, the Deputy Village Clerk. In September 2000, Cannon became the Deputy Village Clerk and supervised Chatman and other Village Clerk's Office employees in Sokol's absence. Chatman and Cannon had a good working relationship. (Def.'s 56.1(a)(3) Statement ¶ 8). On February 12, 2001, Chatman was promoted to the position of Senior Administrative Clerk in the Village Clerk's Office. (Id., ¶ 9).

In 2003, Chatman began complaining that she was being singled out for closer scrutiny than her peers by her manager and that she was being harassed by her co-workers. Spataro worked with Sokol, Cannon, Evans, Wiggins, and, later, Karen Muriello – the current Deputy Village Clerk –

4

throughout Chatman's employment to address Chatman's complaints that were ultimately determined to be unfounded and largely a result of tension and disputes between co-workers in the Village Clerk's Office. (Def.'s 56.1(a)(3) Statement ¶ 11).

On April 20, 2004, Chatman and McMahon got into a verbal altercation regarding Chatman's assignment to make name tags for volunteers for an event Sokol was hosting. (Def.'s 56.1(a)(3) Statement ¶ 14). On April 21, 2004, Chatman sent Spataro an e-mail, relating her version of the altercation. Chatman accused McMahon of placing her hands on Chatman during the verbal dispute regarding whose responsibility it was to make the name tags. Chatman stated that she did not attempt to shove or push McMahon and that she "simply removed her hand off of her chest and made an attempt to get away from her." Chatman left the building immediately after the incident, as she had the afternoon off. McMahon accused Chatman of pushing or shoving her during the incident. (Id., ¶ 15). Chatman also informed Spataro that "no one seems to want to confirm what actually occurred," and that although several people witnessed what happened, "no one was willing to verify the actual facts and true events which leave [her] to believe that [her] effort to try and have the incident verified would be futile." (Id., ¶ 16).

Both Chatman and McMahon filed complaints alleging that they had been pushed or shoved by the other. Chatman further alleged that McMahon instigated the altercation by interfering with and making disparaging comments regarding Chatman's work performance. After investigating the incident, Spataro concluded that any physical contact between Chatman and McMahon was

5

accidental and that no discipline was warranted regarding those allegations. Spataro did find evidence supporting Chatman's allegation that McMahon interfered with and made disparaging comments regarding Chatman's work performance and recommended that McMahon be disciplined. Thereafter, Sokol counseled McMahon about this type of behavior. (Def.'s 56.1(a)(3) Statement ¶ 17).

On September 21, 2004, Chatman filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Chatman alleged that she was subjected to racial harassment, retaliation, and discrimination beginning as early as June 1, 2001, premised upon the Village's failure to hire her for positions outside the Village Clerk's Office for which she had applied, being shoved by a co-worker, receiving a negative 2003 performance evaluation, being singled out to wait on customers, being yelled at by a co-worker, told to take lunch at a different time, and told not to talk. (Def's 56.1(a)(3) Statement ¶ 18). Chatman voluntarily withdrew the charge pursuant to a Mediation Settlement Agreement ("Agreement") signed by the parties on February 3, 2005. Pursuant to the Agreement, Chatman agreed not to file a lawsuit against the Village based upon the events that gave rise to the charge. The Village agreed to discontinue making deductions from Chatman's paycheck for overpayment she had received for sick days, placing Chatman's 2003 performance evaluation in a sealed envelope marked confidential to only be opened upon the approval of the Village Human Resources Director and that Spataro would work with Chatman regarding tips and pointers on resume writing and monitoring the job application process for Chatman. (Id., ¶ 19).

6

Chatman continued complaining about her co-workers' conduct after the settlement. (Def.'s 56.1(a)(3) Statement ¶ 20). Spataro and Sokol also received complaints that Chatman was engaging in conduct that antagonized and upset her co-workers. For example, in March 2005, Chatman questioned whether an Asian co-worker, Jae Lee, should be allowed to work on election materials because he was not a U.S. citizen. Chatman made the statement loudly, in front of the public in the Village Clerk's Office. Chatman also sent an e-mail to Sokol and Cannon, asking whether they were aware that voter registration and voting duties had always been her responsibility, as she had noticed that Jae Lee was doing a lot of research on the internet and retrieving voting information for the department. She inquired whether, as a non-citizen and non-registered voter, it was a "good idea for Jae to even be associated with the voting process." (Id., ¶ 21). The Village Clerk's Office employees also resented Chatman's extensive absences from work that required the other employees to cover for her during those absences. (Id., ¶ 22).

Chatman "stumbled upon" two memoranda written by Jan Jankowski, a non-managerial Village employee in the Village Clerk's Office as Records Coordinator, when Jankowski was absent and Chatman was using her computer to try find steps to open other information Chatman needed. A June 7, 2005 memorandum, addressed to Spataro, informed Spataro that on June 6 and 7, 2005, Jankowski overheard Chatman say, while waiting on customers, that she was under too much tension and pressure and that she was being treated like a slave by the Village and that she was not anyone's slave. (Def.'s 56.1(a)(3) Statement ¶ 23). Jankowski never discussed the memorandum with Chatman nor ever harassed Chatman or made racist comments to Chatman. Chatman was not disciplined for making these statements. (Id., ¶ 24). Chatman denies telling customers that she was being treated like a slave but admits making such comments at work to co-workers. Spataro

7

counseled Chatman regarding these types of comments and suggested that she not make these types of comments at work. During the course of Spataro's discussion with Chatman, Chatman had an anxiety attack. An ambulance was called; and, thereafter, Chatman was granted a medical leave of absence. (Id., ¶ 25).

In or around June 2005, while Chatman was on medical leave, employees reported to Sokol that they overheard Chatman make a comment to her co-worker, Vernell Henderson, which led employees to believe that she had a gun in her purse that she would use "if she had to." Spataro began investigating these allegations; and, due to the seriousness of the allegations, the Village determined that it is was best that Chatman remain on paid leave pending completion of the investigation. Spataro's investigation could not substantiate the allegation that Chatman had brought a gun or weapon to work. In the course of his investigation, Spataro did not speak to Chatman about the allegations. (Def.'s 56.1(a)(3) Statement ¶ 26). Chatman learned of the investigation from Henderson and mentioned to Spataro that she knew about the allegations and investigation. (Id., ¶ 27).

In light of the allegations and counter-allegations between Chatman and her co-workers, Evans and Wiggins held a meeting for all Village Clerk's Office employees in June 2005. The employees were counseled that they needed to set aside their petty differences and personal disputes and act professionally, focusing on their jobs. Chatman was absent the day of the meeting so Wiggins and Evans met with her individually when she returned to work. (Id., ¶ 28).

After her meeting with Evans and Wiggins, Chatman sent an e-mail to the entire Village Clerk's Department, copied to Spataro and Evans, titled "Co-operation." In the e-mail, Chatman stated that after a meeting with Evans, where he informed the Village Clerk's Office that the

8

department is "perceived as dysfunctional" and that "disrespectful behavior" and "several extreme reports of chaos were reported," it was her desire to eliminate any role by her in the situation. She wrote that therefore, she preferred that no one communicate any negative departmental issues with her "during work hours." Chatman also requested that any communication be limited to primary work-related issues, except on breaks or lunch, and that any "significant negative communication" toward her be directed to the appropriate management. She stated that in an effort to eliminate the dysfunctional activity reported to management, she would be maintaining a "quieter yet professional and courteous demeanor." She further stated that she preferred that most communication with her be by e-mail, except for immediate and daily work-related communications, in order to "abide by the rules" and that this did not apply to supervisors, directors or management. (Def.'s 56.1(a)(3) Statement ¶ 29). On June 30, 2005, Cannon retired; and current Deputy Village Clerk Muriello became her successor. Thus, Muriello became responsible for managing the Village Clerk's Office employees, except for McMahon. (Id., ¶ 30).

In an e-mail dated July 12, 2005, entitled "Harassment & Violation of Rights" that was sent to Spataro, Evans, Deputy Village Manager Lisa Shelley, and copied to Union Stewards Liz Melara and Diana Green, Chatman complained that she was being told not to wear her "Bluetooth" wireless cell phone earpiece at work. She complained that her phone was not on, the headset was off, and "now a Director can tell you what kind of items in your ear you can and cannot wear." She also stated, "My earpiece is a statement that I am obeying the law, which was passed July 8, 2005. If I am not allowed to wear an earpiece on my ear then why can other employees wear a cell phone on their hip? I will abide by whatever decisions any Director makes, but I will defend any decisions that violate my rights." (Def.'s 56.1(a)(3) Statement ¶ 31). The following day, Chatman sent

another e-mail to Spataro, copied to Evans, Melara, and Green, stating that in addition to "harassing" her about her "turned off earpiece," Sokol was "hovering" around her desk and that conduct of that type had resulted in her "constant medical condition." (Id., ¶ 32). Spataro reviewed this incident and determined that there was nothing harassing or inappropriate in telling an employee not to wear a "Bluetooth" earpiece while at work. Chatman was required to talk to customers and employees during the work day, and wearing of a personal cell phone headset during this time could be highly distracting. There was also no legitimate reason for Chatman to wear the headset while working because the "law" to which Chatman appeared to be referring was the recent legislation requiring an automobile driver use a headset devise while talking on a cell phone while driving. Chatman did not drive a car as part of her office duties. (Id., ¶ 33).

On July 25, 2005, Chatman had a disagreement with a co-worker, Marijo Lopez, about the proper procedure when issuing vehicle stickers. Lopez was a Senior Administrative Clerk, a non-management Village employee. (Def.'s 56.1(a)(3) Statement ¶ 34). Lopez reported her version of the incident by e-mail. According to Lopez, a young lady and gentleman came to the counter with a blank application and no information regarding her father's two vehicles. Lopez told them that they would have to supply the information regarding her father's vehicles and driver's license before she could issue them vehicle stickers. Neal Bailey, a summer intern, went to the counter and told them he could sell them stickers; and Chatman agreed and told them that Chatman could supply the vehicle and license information because the young lady had a blank check from her father. Lopez did not disclose the father's vehicle/personal information; instead, she phoned the father, who worked in the State's Attorney's Office. The father later told Lopez he appreciated her not giving out his vehicle or personal information. (Id., ¶ 35). Chatman also reported her version of

the incident in an e-mail, titled "Department Harassment." Chatman cited the incident as an example of how Lopez had "a problem" with her and Henderson, an African-American co-worker. Chatman wrote that Lopez made a "great effort to accused [sic], inflicts unease, frustration, and attempts to have [them] removed from job duties and employment with both of [them]." Chatman claimed that she never agreed to give out information and that the application was subsequently processed by Renee Borman, who said that the young couple returned with the required documentation. Chatman informed Spataro that Lopez would "stoop to any level even to the point of false allegations to discredit and cause problems" with her and Henderson. Chatman stated that is was "very difficult to have to keep defending" herself against "outrageous behavior and accusations." (Id., ¶ 36).

On October 6, 2005, Chatman asked a co-worker, Linda Sacramento, to switch lunch times with her. When Chatman approached Sacramento about switching lunch times, Sacramento became "very belligerent" in that she "walked around from person to person in the department . . . and expressed very loudly that she didn't care when [Chatman] wanted to go to lunch" because "she was taking her lunch at 1:00 . . . she wasn't changing lunches with anybody." Chatman felt that Sacramento's tone was "very intimidating and unprofessional." (Defendant's 56.1(a)(3) Statement ¶ 37).

On October 31, 2005, Chatman and McMahon had another disagreement about Chatman's ability to "make-up" fifteen minutes of time she lost by being late for work. McMahon was responsible for preparing and entering payroll for all employees of the Village Clerk's Office. While reviewing the employee time sheets prior to entering them into the payroll system, McMahon discovered that Chatman was fifteen minutes short of having a full seventy-five hours for the pay

11

period because she was fifteen minutes late for work. McMahon informed Chatman of this, and they argued about whether Chatman could use the extra fifteen minutes of time she had worked the day she was late to make up the time. (Def.'s 56.1(a)(3) Statement ¶ 38). A verbal altercation took place, during which McMahon told Chatman that she was "good for nothing. [You] come in there to get a paycheck for nothing, for doing nothing." Chatman also accused McMahon of "poking" her in the side during the course of the argument when Chatman would not respond to McMahon's "ranting and raving." (Id., ¶ 39). Spataro investigated the incident and interviewed witnesses. Spataro was unable to confirm Chatman's allegation that McMahon "poked" or otherwise touched Chatman. Based on a decision by Spataro following the investigation, the Village issued Chatman and McMahon a two-day suspension for engaging in "threatening, unprofessional, disruptive and egregious behavior" in the workplace. (Id., ¶¶ 40-41). Chatman believes that Sokol allowed McMahon to "make-up" the two-day suspension by permitting her to work the weekend after the suspension. McMahon worked on weekends in an effort to help Sokol "catch-up" on work that had not been completed during the normal work week. Sokol avers that she was not permitted to "make-up" the time for the two-day suspension. (Id., ¶ 42). At the time of the incident, Sokol was McMahon's supervisor; and Muriello was Chatman's supervisor. (Id., ¶ 43).

On the same day as the incident with McMahon, Chatman accused Sacramento of slamming her shoulder into her while walking past her. This occurred in a narrow area between a desk and a cabinet in which people often bumped each other when they walked by each other. Chatman alleges that Sacramento stated, "That was for this morning." (Def.'s 56.1(a)(3) Statement ¶ 44). Chatman filed police reports against McMahon and Sacramento, accusing them of assaulting her

at work on October 31, 2005. Both Spataro and the police department investigated the incidents and interviewed witnesses and could not confirm that McMahon or Sacramento touched Chatman. (Id., ¶ 45).

Chatman found McMahon difficult with whom to work; and McMahon not only addressed Chatman in a disrespectful manner or with a raised voice but treated others in the department in the same manner. This included McMahon's yelling at Sokol, her supervisor, on a number of occasions. (Def.'s 56.1(a)(3) Statement ¶ 46). Chatman also believes that Sacramento would not address questions to her regarding duties that Sacramento knew Chatman was in charge of in the Village Clerks' Office. Chatman believes that Sacramento and others would engage in this behavior to "antagonize" her and "to eliminate [her] from the process of one of [her] job duties and functions." (Id., ¶ 46). Although Chatman believes that McMahon and Sacramento knew that she had filed an EEOC charge, Chatman does not have any proof that Sokol, McMahon or Sacramento had any knowledge that she had filed a lawsuit or EEOC charge at the time of the October 31, 2005 incidents. (Id., ¶ 48). Sacramento and McMahon informed Sokol that Chatman had filed police reports against them and that she threatened to sue them individually, taking the equity out of their homes. Chatman's comments made Sacramento and McMahon uncomfortable and made it difficult to engage in a productive working relationship with Chatman. (Id., ¶ 52). After returning to work following the two-day suspension, Chatman met with Wiggins and Spataro. Wiggins informed Chatman that she should avoid confrontations with co-workers, be at work on time, and follow the rules. (Id., ¶ 49).

In November 2005, Chatman filed a charge of discrimination with the EEOC that is the subject of the instant lawsuit. (Def.'s 56.1(a)(3) Statement ¶ 50).

13

In a January 12, 2006 e-mail to Spataro and Muriello, titled "Antagonizing and Harassing Behavior," Chatman complained that Sacramento was giving her "dirty little looks, sniping little remarks." The following day, Chatman sent another e-mail, titled "Taunting Behavior"; Chatman claimed that if she had to interact with Sacramento and ask her about something work related, Sacramento would snap at her or angrily say something. For example, Sacramento would taunt Chatman by looking at her and then laughing in her face or by looking at her and then angrily snapping her head in the opposite direction. She claimed that Sacramento was listening to her conversations with others and watching her every movement. Chatman believed that it was obvious that Sacramento was looking for some way "to entrap or provoke" her because of her anger and dislike for her. Sacramento's behavior made Chatman nervous and pressured her to be cautious in anything she did or said. In order to calm herself, Chatman hummed softly, of which Sacramento complained to Muriello that Chatman was humming. (Def.'s 56.1(a)(3) Statement ¶¶ 53- 54) Sacramento would also direct others to someone other than Chatman if they asked Sacramento for assistance on a job duty. For example, Sacramento would direct people with chauffeur license questions to someone other than Chatman, even though the licenses were part of Chatman's duties. (Id., ¶ 55). On December 8, 2005, Muriello responded to Chatman's e-mails, stating that Chatman needed to be patient with Sacramento because she was likely unhappy with Chatman because Chatman had filed a police report agianst her and that the only "cure" she knew of was "the passage of time." Muriello encouraged Chatman to focus on her job and to do the best she knew how. (Id., ¶ 56).

While Chatman never heard McMahon, Jankowski, Lopez, Sacramento or Sokol make any racist comments, Chatman believed they engaged in harassing behavior against her. (Def.'s 56.1(a)(3) Statement ¶ 60). This included co-workers' "inadvertently saying things in [her] presence" and standing in front of her and saying little things and whispering in an attempt to get her to respond and get her upset. (Id., ¶ 58). At one point, after Chatman had complained to Spataro about McMahon's conduct, McMahon glared at her and, while appearing angry, repeatedly stated, "I am sick of this shit." (Id., ¶ 59).

At Spataro's direction and in response to Chatman's complaints, Muriello began to work "out in the open" with the other employees instead of in her closed office in order to monitor all of the employees, observe the work atmosphere, and to ensure that employees were carrying out their duties in a professional manner. Spataro also counseled Muriello on multiple occasions on ways to diffuse the issues in the Village Clerk's Office. (Def.'s 56.1(a)(3) Statement ¶ 61). Chatman believes that Sokol told Cannon and Muriello to "lean on" her and to "monitor" her on the basis of her race. (Id., ¶ 63). For example, Chatman was repeatedly called "into the office for minor stuff; phone monitoring which was protocol but never really utilized became a factor . . .; evaluations were always not good; [her] grammar was attacked and made reference to; [she] discovered notes that were written about [her] that were distributed to [Sokol] and Ed Evans by co-workers; co-workers were watching [her] closely; allegations were being made against [her] by those co-workers; [her] time was always questioned; [her] time was always challenged; [she] was not given the same latitude as the non-African-American employees; other employees were given promotions or bigger titles and more money and [she was] given more responsibilities and duties than other employees." (Id., ¶ 64). The "minor stuff" that she would be "called into the office" for included

15

questions about her time sheets and phone usage. Chatman agrees that a manager's duties include inquiring about time sheets and making sure that employees are not spending too much time on personal business. (Id., ¶ 65). As another example, Chatman points to a "lazy" day when several employees were "chitchatting" and Cannon came out of her office and inquired, "Are you guys talking or doing work?" Cannon did not address Chatman or Henderson by name, but Chatman believed that Cannon was only addressing her and Henderson. Chatman does not know if Cannon made similar comments to other employees. (Id., ¶ 66).

At some point (that Chatman cannot recall), Sokol began distributing phone reports documenting each employee's phone usage to each employee, and spoke in her office with Chatman and Henderson about phone usage. Prior to this meeting, Chatman used the Village telephone to make personal calls. After the meeting, Chatman stopped using the Village telephone for personal calls. (Def.'s 56.1(a)(3) Statement ¶ 67). All the Village Clerk's Office employees were jointly counseled regarding this issue, issued a memo about procedure and protocol, and issued monthly phone reports regarding phone usage. (Id., ¶ 68).

Other Village Clerk's Office employees received discipline. After Chatman and others complained that Jankowski had been cursing in front of co-workers and customers, she was counseled and reprimanded for her unprofessional conduct. (Def.'s 56.1(a)(3) Statement ¶ 69). McMahon was counseled about her unprofessional conduct and interactions with co-workers. (Id., ¶ 70).

Sokol assisted Chatman with work-related and personal issues. Sokol tried to help Chatman locate her adult son when he was thought to be missing by asking the Village police to search for him. Sokol accompanied Chatman to the hospital and sat with her while she was waiting to be seen

16

by a doctor on more than one occasion and accompanied her home from work when she was not feeling well and loaned her money. However, Chatman believes that Sokol made belittling comments to her, including comments about her hair and clothes and to work on her grammar. (Def.'s 56.1(a)(3) Statement ¶ 71).

Chatman believes that her December 2005 evaluation was "inaccurate and misleading" because it included a comment that Chatman needed to improve her grammar. (Def.'s 56.1(a)(3) Statement ¶ 72). Prior to this evaluation, other evaluations also commented that Chatman needed to improve her grammar. (Id., ¶ 74). Muriello's comments about Chatman's grammar were confined to her written work, not her verbal grammar or her work involving interaction with the public. (Id., ¶ 80). Chatman agrees that her e-mails included "many errors," that she rarely proof-read e-mails she sent, and that her "grammar could use a lot of work." (Id., ¶¶ 77, 79). In the December 2005 evaluation, Muriello rated Chatman no lower than a three (meets expectations) in every category and rated her "above expectations" in several categories. (Id., ¶ 73). Chatman believes that this evaluation was discriminatory and retaliatory because Muriello praised certain work and "[t]hen comes back and say [sic], but your grammar is this, and that's my main thing about the whole evaluation. On the one hand you push me up and then on the other hand you bring me down. It's contradictory." (Id., ¶ 79). According to Chatman, during her meeting with Muriello to discuss her December 2005 evaluation, after Chatman asked Muriello what she could do to have a better relationship with other employees, Muriello responded, "Drop the lawsuit." (Id., ¶ 81). Chatman reported this comment to Spataro, who recommended that Muriello be reprimanded for her conduct. The Village issued Muriello a written reprimand and arranged for her to receive management training and education. (Id., ¶ 82).

17

Spataro believes that he did all that he could in responding to Chatman's numerous e-mails and complaints. In light of the approximately 450 Village employees, it was not possible for him to devote more time and resources to one employee's complaints. (Def.'s 56.1(a)(3) Statement ¶ 84). After investigating Chatman's complaints about her co-workers' harassment, Spataro concluded that the complaints amounted to general workplace complaints and disputes that stemmed from Chatman's inability to get along with her co-workers due largely to her own workplace demeanor and conduct and that the disputes were not based on race or retaliation. Spataro also concluded that Chatman's managers treated Chatman equitably and in a similar manner as they treated other Village Clerk's Office employees. (Id., ¶ 85). Spataro found no credible evidence of any race-based animus or harassment. (Id., ¶ 86).

Spataro, in conjunction with Union Stewards and Evans, tried to secure Chatman a transfer to another department in an effort to accommodate her desire to work within the Village but outside of the Clerk's Office. (Def.'s 56.1(a)(3) Statement ¶ 87). Initially, union representatives were hesitant to allow the Village to bypass normal job-posting procedures to assist Chatman. However, in January 2006, Union Stewards Melara and Lopez reported to Evans that they had additional information regarding the earlier allegations that Chatman had brought a gun to work and would testify against Chatman if asked to do so. Based on this information, on January 19, 2006, Evans recommended to Spataro that the Village re-open the previous investigation into these allegations. Spataro declined to do so because he could corroborate the allegations when they were first made, and he considered the matter closed. (Id., ¶ 88).

18

Spataro did obtain approval to bypass the Village's normal hiring process in order to assist Chatman in her efforts to transfer out of the Clerk's Office. On or around January 18, 2006, the Village offered Chatman the position of Records Clerk in the Police Records Department in response to her repeated requests to be transferred to another department within the Village. Chatman declined this position because she did not want to work in that department because it was located in the basement of the Village Hall. (Def.'s 56.1(a)(3) Statement ¶ 89). During this time, Muriello issued Chatman a verbal reprimand for violating the Clerk's Office e-mail protocol by directly addressing a senior manager in another department. (Id., ¶ 90). This verbal reprimand came following repeated efforts to get Chatman to refrain from improper e-mail usage. (Id., ¶¶ 91-93).

In March 2006, Spataro offered Chatman another transfer opportunity, which Chatman accepted. On March 27, 2006, the Village transferred Chatman to the position of Senior Administrative Clerk in the Parking Permit Office at the same rate of pay she had received in the Clerk's Office. (Id., ¶ 94).

Prior to the position in the Parking Permit Office, Chatman believes that she applied for seventeen different positions. The majority of these positions for which Chatman applied were ultimately given to African-Americans. (Def.'s 56.1(a)(3) Statement ¶¶ 95-96).

While Chatman was on medical leave in June 2005 following her anxiety attack at work and in February 2006 following a traffic accident, she was required by the Village to see the Village's occupational health doctor before returning to work. The Village's Personnel Manual allows for this procedure; and Spataro believed that it was in the Village's and Chatman's best interests to

19

have the Village's occupational health doctor see Chatman, in light of the circumstances surrounding the September 2005 leave and the length of absence in February 2006 (fourteen days). (Plaint.'s 56.1(b)(3) Statement ¶ 2; Def.'s Response ¶ 2).

## ANALYSIS

Chatman's discrimination claims are brought under Title VII and 42 U.S.C. §§ 1981, 1983. The standard for establishing discrimination under Title VII and Sections 1981 and 1983 are identical. *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007) (*Humphries*); *Helland v. South Bend Cmty. Sch. Corp.*, 93 F.3d 327, 329 (7th Cir. 1996).

### Race Discrimination Claims

A plaintiff may prevail on her discrimination claim either through the "direct method" – showing intentional discrimination – or through the similar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Blise v. Antaramian*, 409 F.3d 861, 866 (7th Cir. 2005) (*Blise*). The direct method of proving discrimination requires the introduction of direct or circumstantial evidence of discrimination. Direct evidence requires, essentially, an admission by the defendant that the action was based on a prohibited animus. *See Blise*, 409 F.3d at 866. Chatman concedes that she does not present direct evidence of discrimination, and she proceeds under the indirect method.

To establish a *prima facie* case of race discrimination under the *McDonnell Douglas* framework, Chatman is required to demonstrate that: (1) she was a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees not in the protected class were

20

treated more favorably. *See Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 650 (7th Cir. 2001). If Chatman demonstrates a *prima facie* case, the burden shifts to the Village to demonstrate "a legitimate, nondiscriminatory reason for the action." *Blise*, 409 F.3d at 867. If the Village meets this burden, the burden shifts back to Chatman to demonstrate the proffered reason is pretextual. *Blise*, 409 F.3d at 867.

Chatman is a member of a protected class and was meeting the Village's legitimate performance expectations. Chatman argues that the Village's requirement that she see the Village's occupational health doctor in June 2005 and July 2006 before she could return to work following her extended absences was a materially adverse action. An adverse action must be materially adverse, one that significantly alters the terms and conditions of the employee's job. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (*Griffin*). Actions such as harder work assignments, additional job responsibilities, unfair reprimands, and oral and written reprimands do not constitute an adverse action. *See Griffin*, 356 F.3d at 829 (collecting cases). However, an unpaid suspension and termination do constitute an adverse action. *See Whittaker v. Northern Illinois Univ.*, 424 F.3d 640, 647 (7th Cir. 2005) (*Whittaker*). The Village's requirement that Chatman see the occupational health doctor does not constitute an adverse job action.

Even if the requirement that Chatman see the Village's occupational health doctor was considered an adverse job action, Chatman has failed to identify similarly situated employees that were not in the protected class that were treated more favorably. A plaintiff demonstrates that another employee is "similarly situated" to her by "show[ing] that there is someone who is directly

comparable to [her] in all material aspects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). A court must look at all relevant factors, the number of which depends on the specific case, when making this determination. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (*Radue*).

Chatman "believes" that non-African-American employees Jankowski and Jackie Speelman were not required to see the Village's occupational health doctor when they took extended medical leave. However, Chatman cannot demonstrate a *prima facie* case and defeat summary judgment based on her "belief" and unsubstantiated facts. *See Hemsworth,* 476 F.3d at 490.

Assuming argumendo, that Chatman had presented a *prima facie* case, she has also failed to demonstrate that the Village's legitimate, non-discriminatory proffered reasons for requiring her to see the occupational health doctor were a pretext to discrimination.

To demonstrate pretext, a plaintiff must show that the employer's explanation is unworthy of credence or that a discriminatory reason more likely motivated the employer. *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998) (*Debs*). Pretext in this context does not mean a mistake; rather, it means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir 1995).

Chatman does not address the pretext element of her claims, and she has failed to present any evidence that the Village's reasons for requiring her to see the occupational health doctor were merely pretext to discrimination.

Based on the above, summary judgment is granted in the Village's favor on Chatman's race discrimination claims.

22

## Retaliation Claim

Title VII also prohibits an employer from retaliating against an employee that has complained of unlawful practices. *See* 42 U.S.C. § 2000e-3(a). An employee may present either direct or indirect evidence of retaliation. *See Humphries*, 474 F.3d at 404. Under the direct method, a plaintiff must show: (1) she engaged in a statutorily protected activity, (2) she was subjected to an adverse employment action, and (3) there is a causal connection between the two events. *See Humphries*, 474 F.3d at 404.

Chatman engaged in a statutorily protected activity by filing an EEOC charge. Chatman argues that, as to her retaliation claim, the adverse action taken against her was the continuous negative treatment she received while in the Clerk's Office – for example, unfounded allegations that she brought a gun to work, daily confrontations with co-workers that were not properly addressed by management, and a "questionable" reprimand for sending certain e-mails. These actions do not constitute an adverse job action. *See Griffin*, 356 F.3d at 829.

Chatman also identifies her two-day suspension as an adverse job action. An unpaid suspension can constitute an adverse job action. *See Whittaker*, 424 F.3d at 647. Neither party indicates whether the suspension was paid or unpaid. However, assuming that the suspension was unpaid, Chatman fails to demonstrate a causal connection between the suspension and the filing of the EEOC charge and resulting settlement. First, McMahon also received a two-day suspension for the same incident; and Chatman's "belief" that McMahon was able to "make-up" the time does not demonstrate a causal relationship. *See Hemsworth*, 476 F.3d at 490. In addition, the two-day suspension took place approximately nine months after the settlement that arose from the EEOC charge. *See Filipovic v. Express Sys., Inc.*, 176 F.3d 390, 399 (7th Cir. 1999) (no causal

23

relationship found based on timing of alleged adverse action that took place four months after the protected activity); *Davidson v. Midelfort Clinic,* 133 F.3d 499, 511 (7th Cir. 1998) (no causal relationship found based on timing of alleged adverse action that took place five months after the protected activity).

Under the indirect method, a *prima facie* case of retaliation requires the plaintiff to demonstrate that: (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite meeting her employer's legitimate job expectations, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. If the plaintiff establishes a *prima facie* case, the employer must offer a legitimate, noninvidious reason for the adverse employment action. Once the employer does this, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason for termination is a pretext to retaliation. *See Tomanovich v. City of Indianapolis,* 457 F.3d 657, 663 (7th Cir. 2006).

As addressed above, Chatman's two-day suspension may constitute an adverse job action. However, Chatman has failed to demonstrate that she was treated less favorably than others that did not engage in statutorily protected activity. Both Chatman and McMahon, a non African-American, received two-day suspensions; and Chatman cannot simply rely upon her "belief" that McMahon was able to "make-up" the time. Furthermore, Chatman and McMahon were not similarly situated. In disciplinary cases in which the plaintiff alleges that she was disciplined more harshly than a similarly situated employee, the plaintiff must show that she is similarly situated with respect to performance, qualifications, and conduct. *See Radue,* 219 F.3d at 617. "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards,

24

and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue*, 219 F.3d at 617-18. Chatman and McMahon had different positions in the Clerk's Office and reported to different individuals.

Even if Chatman had demonstrated a *prima facie* case of retaliation under the indirect method, she has failed to demonstrate that the Village's reason for suspending her for two days following the incident with McMahon was pretext to retaliation.[1]

Based on the above, summary judgment is granted in the Village's favor on Chatman's retaliation claim.

### Hostile-Work-Environment Claim

It is unclear whether Chatman is alleging she was subjected to a hostile work environment. The Village addressed this possible claim in its opening brief; and Chatman states in her response that she alleges "race based discrimination, retaliation, and hostile work environment harassment." However, Chatman presents no argument as to a hostile-work-environment claim in her response brief.

Assuming Chatman is alleging a hostile-work-environment claim, she must demonstrate: (1) the workplace was permeated with discriminatory intimidation, ridicule, or insult that was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment; (2) the harassment was based on plaintiff's race; (3) the plaintiff perceived the work environment to be hostile or abusive; (4) a reasonable person would have

---

[1]Chatman does not argue that the two-day suspension was an adverse action in support of her race discrimination claim. However, that claim, if based on the two-day suspension, would fail for these same reasons.

perceived the work environment to be hostile or abusive; and (5) the employer knew or reasonably should have known that the plaintiff was being subjected to such treatment, and it did not take appropriate corrective action. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (7th Cir.1999).

For harassment to be actionable under Title VII, the employer's actions must be sufficiently severe or pervasive so as to "alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 477 U.S. 57, 67 (1986). Title VII is not directed against unpleasantness *per se* but, rather, against discrimination in the conditions of employment. *Drake v. Minnesota Mining & Mfg. Co.*, 143 F.3d 878, 885 (7th Cir. 1998), (quoting *Carr v. Allison Gas Turbine*, 32 F.3d 1007, 1009 (7th Cir. 1994)). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) (*Harris*).

Chatman alleges numerous actions/comments created a hostile work environment. These actions include: (1) arguments with co-workers; (2) the October 2005 incident with McMahon that resulted in a two-day suspension; (3) looks or comments by co-workers that Chatman perceived as hostile or made to antagonize her; (4) allegations that she brought a gun to work; (5) managements' monitoring of her work and telephone calls; (6) Sokol's comments about her hair and clothes; and (7) dirty looks and comments by co-workers after she filed police reports against other co-workers.

26

Chatman has failed to demonstrate that the alleged actions by co-workers was so sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive working environment. Furthermore, she has failed to demonstrate that the conduct or actions were based on her race. Accordingly, summary judgment is granted in the Village's favor as to Chatman's hostile-work-environment claim.

### Section 1983 Claim

Chatman cannot prevail on her Section 1983 claim for the reasons stated above. Furthermore, Chatman has failed to demonstrate that she was deprived of a constitutionally protected right to be free from unlawful race discrimination/harassment pursuant to a "custom, policy, or practice" of the Village.

To prevail on a Section 1983 claim, a plaintiff must demonstrate that an alleged constitutional right deprivation was caused by a policy, custom, or practice. *See Monell v. Department of Social Serv.*, 436 U.S. 658, 692 (1978). Unconstitutional policies or customs can take three forms: an express policy that, when enforced, causes a constitutional deprivation; a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a usage or custom with the force of law; or a constitutional injury that was caused by a person with final policy-making authority. *Brokaw v. Mercer County*, 235 F.3d 1000, 1013 (7th Cir.2000).

Chatman argues that Sokol and Muriello were persons with final-policymaking authority that engaged in discriminatory practices. Chatman cites no authority for her assertion that Sokol and Muriello have final policy-making authority for the Village. A plaintiff must set forth proper

27

authority to establish, as a matter of law, that an individual has final policy-making authority. *See* *Rasche v. Village of Beecher*, 336 F.3d 588, 600 (7th Cir. 2003). To have final policy-making authority, an individual must possess the responsibility for making law or setting policy. *See* *Killinger v. Johnson*, 389 F.3d 765, 771 (7th Cir. 2004). Chatman has failed to affirmatively demonstrate, by specific factual allegations, that a genuine issue of material fact exists as to whether Sokol and/or Muriello had final policy-making authority. *See Hemsworth*, 476 F.3d at 490.

## CONCLUSION

For the foregoing reasons, the Village's Motion for Summary Judgment is granted.

Dated: February 21, 2008

JOHN W. DARRAH
United States District Court Judge